**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Beth H. Ong, | No. CV-17-00960-PHX-BSB |
| Plaintiff, | **ORDER** |
| v. | |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Beth H. Ong seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for benefits under the Social Security Act ("the Act"). The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b), and have filed briefs in accordance with Rule 16.1 of the Local Rules of Civil Procedure. As discussed below, the Court reverses and remands for a determination of benefits.

## I. Procedural Background

In September 2013, Plaintiff filed an application for a period of disability and disability insurance benefits under Title II of the Act. (Tr. 13.)[1] After the Social Security Administration ("SSA") denied Plaintiff's initial application and her request for reconsideration, she requested a hearing before an administrative law judge ("ALJ"). (*Id.*) After conducting a hearing, the ALJ issued a decision finding Plaintiff not disabled under the Act. (Tr. 26-40.) This decision became the final decision of the Commissioner

---

[1] Citations to Tr. are to the certified administrative transcript of record. (Doc. 13.)

1   when the Social Security Administration Appeals Council denied Plaintiff's request for
2   review. (Tr. 1-7.) *See also* 20 C.F.R. § 404.981 (explaining the effect of a disposition by
3   the Appeals Council). Plaintiff now seeks judicial review of this decision pursuant to
4   42 U.S.C. § 405(g).

5   **II.    Administrative Record**

6          The administrative record includes medical records pertaining to the history of
7   diagnoses and treatment related to Plaintiff's alleged impairments, including seizure
8   disorder, degenerative disc disease of the lumbar spine, bipolar disorder, post-traumatic
9   stress disorder, and social phobia. (Tr. 30.) The record also includes several medical
10  opinions. The Court discusses the relevant treatment evidence below and discusses the
11  opinion evidence in Section VI.

12         **A.    Treatment Records—Mental Impairments**

13         Plaintiff received treatment from psychiatrist James R. Hicks, M.D., and Joseph
14  Roberson, Ph.D., for bipolar disorder, agoraphobia with panic disorder, social phobia,
15  and post-traumatic stress disorder. (Tr. 286-349, 462-543, 547-65, 590-602, 670-85, 892-
16  901 (Dr. Hicks, Aug. 2009 through Dec. 2015); 606-67, 688-716, 736-45 (Dr. Roberson,
17  Apr. 2013 through Feb. 2016).)[2]

18         **1.    James R. Hicks, M.D.**

19         During an October 2011 appointment with Dr. Hicks, Plaintiff reported mood
20  swings and memory deficiencies. (Tr. 289.) During a May 2012 appointment, she
21  complained of lack of energy, poor memory, hypersomnia, sadness, social anxiety, panic
22  attacks, and occasional symptoms of post-traumatic stress disorder. (Tr. 323.) On
23  examination, Plaintiff had appropriate dress and adequate hygiene, cooperative behavior,
24  normal psychomotor activity, normal speech, a goal directed thought process, intact
25  insight and judgment, and was alert and oriented. (Tr. 323-24.) At a September 18, 2012
26  appointment, Plaintiff reported that she was exhausted, irritable, impatient, and agitated.
27  (Tr. 327.) On examination, Dr. Hicks made findings similar to his May 2012 findings.

28
---
[2]   The relevant period for Plaintiff's application for disability insurance benefits is
September 18, 2011 through December 31, 2014. (Tr. 39.)

(*Compare* Tr. 323-24 *with* Tr. 327-29.)   In October 2012, Plaintiff reported that her "mood was empty, she had anhedonia, [and] she [felt] emotionless." (Tr. 331.)  She had suicidal thoughts with a plan to overdose on medication.  (*Id.*)  With the exception of noting Plaintiff's suicidal thoughts (Tr. 332), Dr. Hicks' examination findings were similar to his September 2012 findings.  (*Compare* Tr. 327-29 *with* Tr. 331-33.)

In January 2013, Plaintiff reported "unrelenting sadness/doom and gloom." (Tr. 335-37.)   Dr. Hicks' findings on examination were similar to his past findings. (*Compare* Tr. 327-29 *with* Tr. 335-37.)   Dr. Hicks prescribed Lexapro and referred Plaintiff for counseling.  (*Id.*)  In February 2013, Plaintiff reported an improved mood with Lexapro, but she reported atypical snacking.  (Tr. 339.)  Similar to Dr. Hicks' previous findings, on examination he noted that Plaintiff had an appropriate appearance and adequate hygiene, cooperative behavior and good eye contact, normal psychomotor activity, normal speech, a congruent mood, goal directed thought process, intact insight and judgment, and was alert and oriented.  (Tr. 339-41.)

In May 2013, Plaintiff reported that her mood was good, but she lacked energy. (Tr. 343.)  Dr. Hicks adjusted the timing of Plaintiff's psychiatric medications to address that issue.  (Tr. 345.)  Dr. Hicks' findings on examination were consistent with his past findings.  (*Compare* Tr. 339-41 *with* Tr. 343-44.)   In an August 2013 treatment note, Dr. Hicks indicated that Plaintiff's mood was good, but that she had continued fatigue. (Tr. 347.)   Dr. Hicks' examination findings were consistent with his past findings. (*Compare* Tr. 342-44 *with* Tr. 347-48.)

In December 2013, Dr. Hicks noted that Plaintiff had been "stable" at her last appointment in August, but she reported worsening depression over the past six-to-seven weeks with suicidal thoughts and a plan to overdose.  (Tr. 563.)  Dr. Hicks recommended psychiatric hospitalization if Plaintiff developed suicidal intent, and increased her dosages of Lexapro and Abilify.  (Tr. 565.)   On examination, Dr. Hicks found that Plaintiff had suicidal thoughts with no intent.  (Tr. 564.)  He described Plaintiff's mood as dysphoric, "sad/depressed," with a restricted affect.  (*Id.*)

In February 2014, Dr. Hicks assessed Plaintiff with "treatment resistant depression" that was unchanged despite prior adjustments to her medications. (Tr. 559.) Dr. Hicks adjusted Plaintiff's medications again. (Tr. 561.) Dr. Hicks' examination findings were similar to his August 2013 findings. (*Compare* Tr. 342-44 *with* Tr. 559-60.) In March 2014, Plaintiff saw Dr. Hicks to complete paperwork for her disability application. (Tr. 554.) Plaintiff reported that her "mood [was] lifting a bit but she [was] not yet in remission." (*Id.*) Dr. Hicks modified Plaintiff's medications again and recommended that Plaintiff continue counseling with her psychologist Dr. Roberson. (Tr. 556.) On examination, Dr. Hicks found that Plaintiff had a disheveled appearance, cooperative behavior with intermittent eye contact, slow speech with "soft volume," a "sad/depressed" and dysphoric mood, a blunted affect, a "circumstantial" thought process, impaired insight and judgment, and was alert and oriented. (Tr. 555-56.)

In April 2014, Dr. Hicks noted that Plaintiff was continuing counseling with Dr. Roberson. (Tr. 550.) Plaintiff reported "overall tiredness/lack of energy and ongoing treatment resistant depression." (*Id.*) Dr. Hicks adjusted Plaintiff's medications. (Tr. 552.) On examination, Plaintiff had appropriate dress and adequate hygiene, cooperative mood and good eye contact, normal psychomotor activity, normal speech, a congruent mood, a goal directed thought process, intact insight and judgment, and she was alert and oriented. (Tr. 550-52.)

In June 2014, Plaintiff reported that she "tend[ed] to feel more tired in the afternoon." (Tr. 596.) Dr. Hicks again adjusted Plaintiff's medications. (*Id.*) Dr. Hicks made examination findings consistent with most of his past examination findings. (*Compare* Tr. 597-98 *with* Tr. 550-52.) In July 2014, Plaintiff reported that she was continuing counseling with Dr. Roberson and described her mood as "overall good." (Tr. 592.) Plaintiff complained of "falling asleep very easily" and Dr. Hicks recommended that she see a sleep specialist. (Tr. 594.) Dr. Hicks' examination findings were consistent with his past examination findings. (*Compare* Tr. 597-98 with Tr. 592-93.)

In October 2014, Dr. Hicks again noted that Plaintiff remained in weekly counseling with Dr. Roberson and assessed Plaintiff with "treatment resistant depression." (Tr. 683, 685.) Dr. Hicks made examination findings consistent with his June 2014 findings. (*Compare* Tr. 683-85 with Tr. 597-98.) In November 2014, Dr. Hicks noted that Plaintiff had "treatment resistant depression." (Tr. 679.) Dr. Hicks' examination findings were consistent with his October findings. (*Compare* Tr. 679-81 *with* Tr. 683-85.)

In January 2015, Plaintiff reported worsening depression with thoughts of suicide and a plan to overdose. (Tr. 675.) She also reported negative thinking, low energy, low motivation, anhedonia, hopelessness, a feeling of worthlessness, irritability, frustratation, self-isolation, poor memory, and poor concentration. (*Id*.) Dr. Hicks recommended inpatient psychiatric hospitalization if Plaintiff developed suicidal intent, and added a retrial of Abilify. (Tr. 677.) On examination, Dr. Hicks noted that Plaintiff had a euthymic mood and suicidal thoughts. (Tr. 675-77.)

## 2. Joseph Roberson, Ph.D.

Dr. Roberson treated Plaintiff for depression starting in April 2013.[3] (Tr. 607-67, 688-716, 736-45 (treatment notes from Apr. 2013 through Feb. 2016).) He saw Petitioner several times a month throughout that time period.

During two appointments in May 2013, Dr. Roberson noted that Plaintiff was anxious, depressed, and generally alert. (Tr. 655, 657.) He described her diagnosis as unchanged or improved. (*Id*.) During an appointment in June 2013, Dr. Roberson observed that Plaintiff had an appropriate affect and was generally alert. (Tr. 653.) During two appointments in July 2013, Dr. Roberson noted that Plaintiff was anxious and depressed, but he found that she was generally alert and her diagnosis was improved. (Tr. 688, 689.) During an appointment in August 2013, Dr. Roberson noted that Plaintiff had suicidal thoughts. (Tr. 649.) During an appointment in October 2013, Dr. Roberson

---

[3] Dr. Roberson's handwritten treatment notes are difficult to read, which limited the Court's ability to discuss those records. The Court does not discuss treatment records that post-date the date last insured. (Tr. 736-75.)

noted that Plaintiff was generally alert, and that her diagnosis was improved.  (Tr. 639.)
In December 2013 Dr. Roberson noted that Plaintiff had suicidal thoughts.  (Tr. 634.)
Dr. Roberson also noted that Plaintiff had suicidal thoughts in August, September, and
October 2014.  (Tr. 607, 609, 614, 715.)  During several appointments with Plaintiff in
September and October 2014, Dr. Roberson found that Plaintiff was anxious, depressed,
and confused.   (Tr. 607, 609, 610.)   He also noted that Plaintiff's condition had
"declined."  (*Id*.)

### B.     Treatment Records—Physical Impairments

#### 1.     Stephen Hempelman, M.D.

Neurologist Dr. Hempelman treated Plaintiff for seizure disorder.  (Tr. 391-458,
462-543, 566-74, 603-05, 719-30, 1041-46 (Feb. 2009 through Dec. 2015).)  In August
2011, Plaintiff reported having focal seizures several times a week that involved the
right-side extremities with persistent clonic movements, and lasted several minutes.
(Tr. 448.)  Dr. Hempelman adjusted Plaintiff's medications.  (Tr. 449.)  On November 4,
2011, Plaintiff was admitted to the hospital for observation due to seizures and
generalized tremulousness.  (Tr. 447.)  During a January 3, 2012 appointment, Plaintiff
reported continued involuntary jerking movements of her bilateral extremities, occurring
several times a week, and lasting several minutes to several hours per episode.  (Tr. 445.)
Plaintiff also reported three seizure episodes.  (*Id*.)

Plaintiff was hospitalized in February 2012 for Dilantin toxicity that caused
blurred vision and an ataxic gait.  (Tr. 353-354.)  Plaintiff reported that her last seizure
was fourteen days before her hospitalization.  (Tr. 353.)  Plaintiff's seizure medication
was increased.  (*Id*.)  In May 2012, Dr. Hempelman decreased Plaintiff's dosage of
Tegretol to avoid medication toxicity.  (Tr. 443.)  In July 2012, Plaintiff reported that her
involuntary right upper extremity jerking had returned, and Dr. Hempelman adjusted
Plaintiff's medication to try to control the limb jerking.  (Tr. 440.)

In December 2012, Plaintiff reported that she had experienced two seizure
episodes in the preceding sixty days, which included head and right upper extremity

jerking followed by exhaustion. (Tr. 435.) In June 2013, Plaintiff reported that her "generalized major motor seizures" were fairly controlled on medication, but she still had frequent "partial complex seizures" that manifested as head bobbing with confusion and difficulty communicating. (Tr. 432.) Dr. Hempelman adjusted Plaintiff's medications in an effort to control the smaller seizures. (Tr. 433.) In September 2013, Plaintiff reported that she had suffered several minor seizures and one big seizure during the past few months accompanied by fatigue that made her "feel like a zombie." (Tr. 429.) Dr. Hempelman noted that Plaintiff's anti-seizure medication made her very fatigued and agreed to taper her off of Keppra. (Tr. 430.) In October 2013, Plaintiff reported that she had to stop taking Keppra due to fatigue. (Tr. 426.) Plaintiff reported that discontinuing Keppra had no effect on the frequency of her focal seizures, and that they occurred several times a week. (*Id.*) Dr. Hempelman increased Plaintiff's dosage of Tegretol. (Tr. 427.)

On October 25, 2013, Plaintiff presented to the emergency room with altered mental status, including slurred speech and gait imbalance as a result of an adverse drug reaction to one of her seizure medications, lamotrigine (Lamictal). (Tr. 361.) Plaintiff reported that she had experienced focal tremors during the past five days and had a grand mal seizure in July 2013. (*Id.*) Plaintiff also reported that she fell and hit her hip and hurt her lower back. (*Id.*) A CT scan of Plaintiff's lumbar spine revealed broad-based disc bulges and chronic bilateral facet degenerative and hypertrophic changes at the L4-5 and L5-S1 levels. (Tr. 365-66.)

In February 2014, Dr. Hempelman noted that Plaintiff reported continued episodes of involuntary movement, stiffness, or rigidity of her upper extremities, which occurred two-to-three times per week and occasionally two-to-three times per day. (Tr. 502.) Dr. Hempelman noted that "a variety of anticonvulsants [had] been tried and found wanting." (*Id.*) In March 2014, Plaintiff reported continued seizures. (Tr. 568.) Dr. Hempelman noted that a 24-hour ambulatory electroencephalogram "done several years ago showed pretty convincing seizure activity," and increased Plaintiff's dosage of

Vimpat. (Tr. 569.) In May 2014, Plaintiff reported continued focal seizures that occurred several times a month. (Tr. 566.) Dr. Hempelman noted that he had "trouble controlling [Plaintiff's] seizures . . . ." (Tr. 567.) Dr. Hempelman adjusted Plaintiff's seizure medications. (Tr. 566.)

In July 2014, Plaintiff reported being seizure-free for three months on Vimpat. (Tr. 603.) In October 2014, Plaintiff presented to the emergency room for a headache and reported that she had suffered a seizure one week earlier, "which [was] her normal frequency." (Tr. 927.) During a November 2014 appointment with Dr. Hempelman, Plaintiff reported one seizure in September and several seizures in October. (Tr. 725.) She also reported severe headaches. (*Id*.)

### 2. Chiropractor Samuel Hester, D.C.

After a fall in October 2013, Plaintiff suffered continuing lower back symptoms. Plaintiff received chiropractic care from Dr. Hester for lower back pain and leg discomfort from August 2014 through December 2015. (Tr. 759-891.) In August 2014, Plaintiff reported increased lower back pain that was aggravated by bending, carrying, and cleaning. (Tr. 759.) Physical examinations revealed tenderness over the coccygeal region, muscle spasms on palpation, pain with range of motion of the lumbar spine, tenderness with palpation of the L4-5 levels, sacrum, and pelvis, and antalgic gait. (Tr. 374 (Nov. 2013), Tr. 759-62 (Aug. 2014), Tr. 764-74 (Sept. 2014), Tr. 775-86 (Oct. 2014), Tr. 787-98 (Nov. 2014), Tr. 799-812 (Dec. 2014), Tr. 813-26 (Jan. 2015), Tr. 827-37 (Feb. 2015), Tr. 838-41 (Mar. 2015), Tr. 842-52 (Apr. 2015), Tr. 853-63 (May 2015), Tr. 864-74 (June 2015), Tr. 875-82 (July 2015), Tr. 883 (Aug. 2015), Tr. 884-91 (Dec. 2015), Tr. 911 (Jan. 2016).)

On December 17, 2014, Dr. Hester noted that Plaintiff's prognosis was good and that she "felt better after the treatment and ha[d] experienced an increase in passive join motion and a decrease in her symptoms since treatment began." (Tr. 805.) The next day, Plaintiff reported her "lumbar and sacral complaint felt the same since the last visit." (Tr. 806.) At a December 19, 2014 appointment, Plaintiff reported that since she had

begun treatment her lower back pain, her left leg pain, and her right leg pain had improved, and that none of her symptoms had stayed the same or worsened. (Tr. 807.) Plaintiff reported the "her condition had gotten slightly better." (*Id*.) On examination, Plaintiff continued to have areas of spasm and point tenderness. (*Id*.) She also had a "significant decrease in the normal range of motion [with] lumbar flexion and right rotation. (*Id*.) Dr. Hester described Plaintiff's prognosis as undetermined. (*Id*.) On December 31, 2014, Plaintiff's "lumbar and sacral complaint felt worse" after she fell on a scooter while playing with her grand kids. (Tr. 812.) On examination, Plaintiff had spasms and point tenderness. (*Id*.) Dr. Hester described her condition as "acute" and described her prognosis as "guarded and uncertain." (*Id*.)

After the date last insured, a December 2015 MRI of Plaintiff's lumbar spine revealed Grade 1 anterolisthesis, a diffuse annular bulge, and severe bilateral facet hypetrophy at the L4-5 level with moderate right neuroforaminal narrowing. The MRI also revealed a diffuse annular bulge at the L5-S1 level, which was likely creating a mass effect (compression) on the exiting right-sided L5 nerve root with severe bilateral facet hypertrophy and severe right neuroforaminal stenosis. (Tr. 757-58.) In January 2016, because of her ongoing lower back pain, Plaintiff had surgery for lumbar fusion at the L4 though SI levels. (Tr. 733.)

III.    **The Administrative Hearing**

Plaintiff was fifty-five years old as of the date of the administrative hearing. (Tr. 37-38.) She had a high school education and past relevant work as an insurance agent and a public relations representative. (*Id*.)

At the administrative hearing, Plaintiff testified that she left work during a lay off in 2009, and that her seizure disorder, back pain, and depression interfered with her ability to work. (Tr. 55-56, 58, 64, 68.) She reported that she had severe fatigue, isolated herself at home, and had suicidal ideation. (*Id*.) Plaintiff testified that she had focal seizures with jerking of her extremities, head, and torso, and that she also had grand mal seizures. (Tr. 57.) She testified that "waiting for a seizure" caused exhaustion and

depression. (Tr. 55.) Plaintiff explained that the frequency of her seizures varied, and that she could have two a day, two a week, or two in one month. (Tr. 56.) Plaintiff's seizures lasted from two-to-nine minutes at a time and were followed by extreme exhaustion. (Tr. 63-64.) Plaintiff also testified that she had frequent thoughts of suicide and crying spells. (Tr. 64-65.) Plaintiff stated that she had difficulty retaining information, and she started tasks but did not complete them because of her memory deficiencies. (Tr. 66-67.) Plaintiff testified that she needed to lie down for three hours every day.[4] (Tr. 70.)

Plaintiff testified that she went on a family trip in November 2015, but she spent time alone and did not go on any "excursions." (Tr. 60.) Plaintiff testified that she shopped online, had someone clean her house, and did not spend time with her grandchildren alone. (Tr. 60-62.) She testified that she occasionally drove about a mile to pick up her medication. (Tr. 63.)

A vocational expert also testified at the hearing. The vocational expert testified that a person with limitations that Dr. Hempelman, Dr. Roberson, or Dr. Hicks assessed— being off task 16 to 20 percent of an eight-hour day— could not sustain work. (Tr. 74-75.) The vocational expert also concluded a person with the limitations to which Plaintiff testified—a need to lie down daily for several hours—could not perform sustained work. (Tr. 75.)

**IV.    The ALJ's Decision**

A claimant is considered disabled under the Social Security Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for supplemental security income disability insurance benefits). To determine whether a

---

[4]  Plaintiff's opening brief states that she had to lie down for several hours daily because of "severe fatigue." (Doc. 17 at 10 (citing Tr. 70).) Plaintiff's testimony, however, does not specify why she had to lie down every day. (Tr. 70.)

claimant is disabled, the ALJ uses a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920.

## A.  The Five-Step Sequential Evaluation Process

In the first two steps, a claimant seeking disability benefits must initially demonstrate (1) that she is not presently engaged in a substantial gainful activity, and (2) that her medically determinable impairment or combinations of impairments is severe. 20 C.F.R. §§ 404.1520(b) and (c), 416.920(b) and (c).  If a claimant meets steps one and two, there are two ways in which she may be found disabled at steps three through five. At step three, she may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. Part 404.   20 C.F.R. §§ 404.1520(a)(4)(iii) and (d), 416.920(d).   If so, the claimant is presumptively disabled.  If not, the ALJ determines the claimant's residual functional capacity (RFC).  20 C.F.R. §§ 404.1520(e), 416.920(e).  At step four, the ALJ determines whether a claimant's RFC precludes her from performing her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education.   20 C.F.R. §§ 404.1520(g), 416.920(g).  If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

## B.  The ALJ's Application of the Five-Step Evaluation Process

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from her alleged disability onset date of September 18, 2011 through the date last insured of December 31, 2014.  (Tr. 30.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "seizure disorder; degenerative disc disease of the lumbar spine; bi-polar disorder; post-traumatic stress disorder; and social phobia (20 CFR 404.1520(c))."  (*Id.*)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment. (*Id.*)

The ALJ found that Plaintiff had the RFC to "perform medium work as defined in 20 CFR 404.1567(c)." (Tr. 32.) The further ALJ found that Plaintiff could never climb ladders, ropes, or scaffolds." (*Id.*) Plaintiff was "precluded from exposure to dangerous machinery with moving or mechanical parts and unprotected heights that are high and exposed." (*Id.*) Plaintiff must "avoid driving on the job." (*Id.*) Additionally, Plaintiff was "limited to tasks that [could] be learned by demonstration within 30 days." (*Id.*)

The ALJ concluded that Plaintiff could not perform her past relevant work. (Tr. 37.) However, based on her age, education, and RFC, Plaintiff could perform other jobs that existed in significant numbers in the national economy. (Tr. 38.) Therefore, the ALJ concluded that Petitioner was not under a disability as defined in the Act from the alleged onset date, September 18, 2011, through the date last insured, December 31, 2014. (Tr. 39.) The ALJ denied Plaintiff's application for a period of disability and disability insurance benefits. (*Id.*)

## V. Standard of Review

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The district court reviews the Commissioner's final decision under the substantial evidence standard and must affirm the Commissioner's decision if it is supported by substantial evidence and it is free from legal error. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008). Even if the ALJ erred, however, "[a] decision of the ALJ will not be reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Substantial evidence means more than a mere scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)

(citations omitted); *see also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005). In determining whether substantial evidence supports a decision, the court considers the record as a whole and "may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotation and citation omitted). The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

## VI. Plaintiff's Claims

Plaintiff raises the following claims: (1) the ALJ erred by failing to provide clear and convincing reasons for rejecting her symptom testimony; and (2) the ALJ erred by rejecting the opinions of treating physicians Dr. Hicks, Dr. Roberson, and Dr. Hempelman. (Doc. 17.) The Commissioner asserts that the ALJ's decision is free from harmful error and is supported by substantial evidence. (Doc. 19.) As set forth below, the Court concludes that the ALJ erred and that these errors were not harmless.

### A. Plaintiff's Symptom Testimony

Plaintiff asserts that the ALJ erred by failing to provide clear and convincing reasons for discounting her subjective complaints. (Doc. 17 at 22-25.) The Commissioner defends the ALJ's assessment of Plaintiff's symptom testimony. (Doc. 19 at 3-12.) As discussed below, the Court finds that the ALJ erred by rejecting Plaintiff's symptom testimony without providing clear and convincing reasons for doing so.

An ALJ uses a two-step analysis to evaluate a claimant's subjective symptom testimony. *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (citing *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"

*Lingenfelter*, 504 F.3d at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom. *Smolen*, 80 F.3d at 1282. Instead, the claimant must only show that an objectively verifiable impairment "can reasonably produce the degree of symptom alleged." *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d at 1160–61 (9th Cir. 2008) ("requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon").

Second, if a claimant shows that she suffers from an underlying medical impairment that could reasonably be expected to produce her other symptoms, the ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how the symptoms limit the claimant's ability to work.[5] *See* 20 C.F.R. § 404.1529(c)(1). At this second evaluative step, the ALJ may reject a claimant's testimony regarding the severity of her symptoms only if the ALJ "makes a finding of malingering based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and convincing reasons" for discounting the symptom testimony. *Carmickle*, 533 F.3d at 1160 (quoting *Lingenfelter*, 504 F.3d at 1036). "This is not an easy requirement to meet: 'The clear and convincing standard is the most demanding required in Social Security cases.'" *Garrison v. Colvin*,

---

[5] After Plaintiff filed her claim, in 2016, the Agency issued Social Security Ruling 16-3p, 2016 WL 1119029 (March 16, 2016) (SSR 16-3p) (effective March 16, 2016), which provides new guidance for ALJs evaluating a disability claimant's statements regarding the intensity, persistence, and limiting effects of symptoms. SSR 16-3p replaces Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996) (SSR 96-7p). SSR 16-3p eliminates the term "credibility" used in SSR 96-7p to "clarify that subjective symptom evaluation is not an examination of the individual's character." SSR 16-3p, 2016 WL 1119029, at *1. "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character," but "obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). The parties do not discuss whether the ALJ followed this ruling and, therefore, the Court does not consider it an issue in this case.

759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).  Plaintiff argues that the ALJ did not provide clear and convincing reasons for rejecting her symptom testimony.  (Doc. 16 at 24.)  As set forth below, the Court concludes that the ALJ erred by discounting this testimony.[6]

As noted in the ALJ's decision, Plaintiff reported that she was unable to work because of her seizure disorder and mental impairments.  (Tr. 33.)  Plaintiff testified that her symptoms included frequent seizures and fatigue, jerking sensations in her hands and feet, depressive and suicidal thoughts, and self-isolation.  (*Id.*)  The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but found that her "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ."  (*Id.*)  As discussed below, the ALJ rejected Plaintiff's symptom testimony as inconsistent with her daily activities, based on the circumstances of the termination of her employment, and as inconsistent with the medical record.  (Tr. 33-35.)

### 1.    Plaintiff's Activities

An ALJ may reject a claimant's symptom testimony if the severity of the alleged symptoms is incompatible with the claimant's daily activities.  *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).  Daily activities may also be "grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting.'"  *Orn*, 495 F.3d at 639 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

The ALJ found that "some of the physical and mental abilities and social interactions required in order to perform [Plaintiff's daily activities] . . . are the same as those necessary for obtaining and maintain employment and are inconsistent with the presence of an incapacitating or debilitating condition."  (Tr. 33.)  Specifically, the ALJ

---

[6]  The Commissioner objects to the clear and convincing standard, but recognizes that the Ninth Circuit continues to apply this standard.  (Doc. 19 at 11 n.3.)

found that Plaintiff's ability to take a trip to Jamaica, and her ability to take another three-week vacation, were inconsistent a finding of disability.[7]  (*Id.* (citing Admin. Hrg. Ex. B10F at 6 (noting that Plaintiff had developed lower leg swelling "especially after a trip to Jamaica), Ex. B31F at 63 (July 2012 treatment note stating that Plaintiff had developed "'sticking' of the left thumb in flexion every [morning] since being on vacation for three weeks and carrying a lot of luggage around.").)  The ALJ did not discuss any details of Plaintiff's travel, including her activities during these two trips.  (Tr. 33.)

Additionally, the ALJ did not explain how Plaintiff's travel was inconsistent with any particular symptom testimony.  (*Id.*)  Plaintiff testified that she took a family vacation to Hawaii for her stepdaughter's birthday.  (Tr. 60.)  Plaintiff described herself as a "killjoy" who did not participate in any "excursions" but instead "sat outside [and] walked the beach alone."  (Tr. 58, 60.)  Evidence that Plaintiff traveled two times during the relevant period, without further detail, is not a clear and convincing reason for discounting her symptom testimony.  *See Moreno v. Colvin*, 174 F. Supp.3d 1112, 1117 (D. Ariz. 2016) (concluding that the plaintiff's trip to Puerto Rico was an insufficient

---

[7]  In her discussion of Plaintiff's symptom testimony the ALJ did not identify any particular activities aside from Plaintiff's travel.  (Tr. 33.)  The Commissioner's response notes that Plaintiff reported she could drive, perform personal care, prepare meals, shop for groceries, do laundry, and "activities."  (Tr. 19 at 9.)  The ALJ mentioned Plaintiff's daily activities in her discussion of the severity of Plaintiff's impairments.  (Tr. 31.)  However, the ALJ did not make a particular finding in her decision that those particular activities supported an adverse credibility determination.  (Tr. 33.)  Thus, the Court cannot consider evidence that Plaintiff engaged in various activities of daily living as part of its evaluation of the ALJ's decision to discount Plaintiff's symptom testimony.  *See Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990) (rejecting link between ALJ's finding about evidence of claimant's daily activities, and adverse credibility determination in other portion of decision, when the ALJ did not "specifically link" the evidence to his conclusion that the claimant's pain testimony lacked credibility).

Moreover, evidence of Plaintiff's activities of daily living was not a legally sufficient basis for the ALJ's rejection of Plaintiff's symptom testimony.  *See Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014) (claimant's performance of basic chores, sometimes with help, and attendance at occasional social events did not show that claimant engaged in activities transferable to a work setting); *Smolen*, 80 F.3d at 1284 n.7 ("[M]any home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."); *Vertigan v. Halter*, 260 F.3d 1044, 1049–50 (9th Cir. 2001) (evidence that claimant did certain chores,which did not consume a substantial part of the day, did not detract from her credibility).

basis for rejecting her testimony regarding pain and fatigue because the ALJ failed to explain how that trip "contradict[ed] any of Plaintiff's specific symptom testimony.").[8]

### 2. Plaintiff's Work History

The ALJ also discounted Plaintiff's symptom testimony because she stopped working due to a business layoff rather than her impairments. (Tr. 33.) The ALJ stated that "this raised a question as to whether [Plaintiff's] continuing unemployment is actually due to medical impairments." (*Id*.) Plaintiff argues that this is not a legally sufficient reason for discounting her symptom testimony because the ALJ did not address her disability onset date of September 2011. (Doc. 17 at 24.) In response, the Commissioner notes that Plaintiff's initial disability onset date was February 2009, which coincided with the date she stopped working. (Doc. 19 at 12 (citing Tr. 49, 203).) Plaintiff did not reply to this argument. (Doc. 23 at 4-5.)

At the administrative hearing, Plaintiff amended her disability onset date to September 18, 2011. (Tr. 26, 50.) Plaintiff's attorney stated that the amendment was "largely academic," and was based on Plaintiff's "possible receipt of unemployment benefits after [her] separation from the workforce." (Tr. 50.) Evidence that Plaintiff left work for a non-medical reason is a clear and convincing reason for discounting her symptom testimony. *See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (concluding that a claimant's pain complaints were not credible because he reported at the administrative hearing, and also to at least one doctor, that he left his job because he was laid off, not because he was injured). Therefore, the ALJ did not err by rejecting Plaintiff's symptom testimony on this basis.

---

[8] The cases the Commissioner cites do not support the ALJ's rejection of Plaintiff's symptom testimony based on her limited travel because in those cases, unlike in this case, the ALJ found that particular aspects of the claimant's travel were inconsistent with the claimant's symptom testimony. (Doc. 19 at 9-10); *see Tommasetti v. Astrue*, 533 F.3d 1035 (9th Cir. 2008) (noting that the ability to travel to Venezuela to care for an ailing sister was inconsistent with the claimant's symptom testimony); *Andrews v. Comm'r of Soc. Sec.*, 2016 WL 8730665, at *10 (E.D. Cal. Feb. 5, 2016) (concluding that the ability to travel to Fort Bragg in a car was inconsistent with a sitting limitation).

### 3. Objective Medical Evidence

The ALJ also discounted Plaintiff's symptom testimony because she found that Plaintiff's "allegations of her symptoms and limitations [were] diminished because those allegations were greater than expected in light of the objective medical evidence . . . ." (Tr. 33.) After a claimant produces objective medical evidence of an underlying impairment, an ALJ "may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the claimant's allegations." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009). However, it is a relevant factor in determining the severity of a claimant's symptoms. *Rollins v. Massanri*, 261 F.3d 853, 857 (9th Cir. 2001). Therefore, the ALJ could consider the lack of corroborating medical records in determining the severity of Plaintiff's symptoms, but could not reject Plaintiff's testimony solely on this basis. As set forth below, the ALJ erred in rejecting Plaintiff's symptom testimony as inconsistent with the medical evidence.

### a. Seizure Disorder

The ALJ concluded that "a review of the record showed that claimant had a history of seizures, which waxed and waned, but overall was not disabling prior to the date last insured." (Tr. 34.) To support that conclusion, the ALJ noted that a CT scan of Plaintiff's head and an MRI of Plaintiff's brain were "essentially negative." (*Id.* (citing Admin. Hrg. Ex. B2F at 16).) She noted that some treatment notes indicted that Plaintiff had intact sensory modalities, no tremors, normal fine finger movements, rapid alternating movements, and no weakness, numbness, tingling, incoordination, or pain in the extremities. (Tr. 34 (citing Admin. Hrg. Ex. B4F at 52 (Tr. 442); Admin. Hrg. Ex. B6F at 42 (Tr. 503).) The ALJ also noted that Plaintiff had no seizures between April and July 2014. (Tr. 34 (citing Admin. Hrg. Ex. B12 F at 1).) The ALJ also noted that the medical records showed that Plaintiff's seizures had been controlled with treatment and that Plaintiff continued to drive despite her seizure diagnosis. (Tr. 34 (citing Admin. Hrg. Exs. B31F at 50, B32F, B9F at 1).)

As Plaintiff notes, the record also includes evidence that Plaintiff failed multiple seizure medication trials and that Dr. Hempelman continually adjusted Plaintiff's seizure medication to control her seizures. (Doc. 17 at 22 (citing Tr. 427, 433, 440, 449, 568).) Plaintiff cites Dr. Hempelman's May 2014 treatment note stating that he was having difficulty controlling Plaintiff's seizures. (Doc. 17 at 22 (citing Tr. 567).) Evidence in the record also indicates that Plaintiff's seizures were controlled by medication for a three-month period as reported by Plaintiff during a July 2014 appointment. (Tr. 603-04.) Impairments that are effectively controlled with medication are not disabling. *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006). However, "[o]ccasional symptom-free periods . . . are not inconsistent with disability." *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995). Plaintiff continued to have seizures after that seizure-free period. (Tr. 725 (reporting a seizure in September and several seizures in October 2014); Tr. 927 (reporting having a seizure one week before Plaintiff presented to the emergency room in October 2014 and stating that was "her normal frequency").) The treatment notes, as a whole, indicate that Plaintiff's seizure disorder was difficult to control and that the frequency of her seizures fluctuated. (Tr. 449, 335, 440, 433, 427, 568); *see Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014) (stating that "the treatment records must be viewed in light of the overall diagnostic record."). Therefore, the Court concludes that substantial evidence does not support the ALJ's conclusion that the severity of Plaintiff's seizure disorder was not supported by the objective medical evidence.

### b. Back Impairment

The ALJ also found that the "objective finding relevant to [Plaintiff's] back impairment [did] not suggest greater limitations than those defined in the [RFC]." (Tr. 34.) The ALJ concluded that Plaintiff's testimony that she "had to recline or nap for 2-3 three hours during an 8-hour day due to pain was not corroborated by any objective evidence." (Tr. 34, 70.) The ALJ also noted that Plaintiff received "conservative, routine, and minimal" treatment for her back prior to the date last insured. (Tr. 34.)

To support her conclusion, the ALJ cited minimal findings on objective testing (Tr. 34 (citing Admin. Hrg. Ex. B3 F at 16-17).) She also cited treatment notes showing that Plaintiff had a normal range of motion on examination. (Tr. 34 (citing Admin. Hrg. Ex. B2F at 6, 8).) The ALJ further noted that Plaintiff's treatment was conservative, consisting of chiropractic care. (Tr. 34 (citing Admin. Hrg. Ex. B25F).) The ALJ noted that Plaintiff was diagnosed with degenerative disc disease of the lumbar spine and spondylolistheses, for which she had spinal fusion surgery on January 13, 2016. (Tr. 35 (citing Admin. Hrg. Ex. B20F at 2-3).) However, because this was after the date last insured (Dec. 31, 2014), the ALJ did not consider that evidence in assessing Plaintiff's symptom testimony. (Tr. 35.)

Plaintiff agrees that she had chiropractic care for her back during the relevant period. (Doc. 17 at 22.) "[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (quoting *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)). Plaintiff's treatment for her back pain during the relevant period consisted of chiropractic care. (Tr. 374, 759-62, 764-74, 775-86, 787-98, 799-812).) Therefore, the ALJ properly discounted Plaintiff's allegations regarding the severity of her back pain based on this conservative care. *See Roomsa v. Colvin*, 2014 WL 5934839, at *8 (D. Ariz. Oct. 13, 2015) (concluding that ALJ properly discounting allegations of pain based on the claimant's conservative treatment that did not include pain medication, injections, or surgical intervention).

### c. Mental Impairments

The ALJ discounted Plaintiff's testimony regarding the severity of her mental impairments because the ALJ believed the medical records showed that Plaintiff's symptoms were improved and stable on medications. (Tr. 35.) The Court finds that this conclusion is not supported by substantial evidence because review of Plaintiff's entire treatment record, including psychiatric medication monitoring and counseling, confirms that Plaintiff's symptoms were not improved on medication and that multiple medications

were tried and were unsuccessful in providing sustained symptom relief during the relevant period.  (Tr. 335-37, 343-45, 552, 561, 556, 597-98.)

In February and October 2014, Dr. Hicks assessed Plaintiff with "treatment resistant depression."  (Tr. 561, 685.)  As discussed in Section VI.C.1.a, the treatment notes, as a whole, indicate that Plaintiff's depression continued throughout the relevant period.  *See Ghanim,* 763 F.3d at 1164.  The Court concludes that substantial evidence does not support the ALJ's conclusion that the severity of Plaintiff's mental impairments was not supported by the objective medical evidence.

An ALJ's assessment of a claimant's symptoms testimony may still be valid, even if some of the reasons for discounting a claimant's statements were not clear and convincing, if the finding remains supported by substantial evidence.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).  Here, the ALJ provided a clear and convincing reason to support her adverse finding as to the severity of Plaintiff's back impairment.  *See* Section VI.A.3.b.  However, the ALJ provided only one valid reason for discounting Plaintiff's symptom testimony regarding the severity of her symptoms related to her seizure disorder and her mental impairments—that Plaintiff left work for a reason other than those impairments.  The Court finds this single reason insufficient to support the ALJ's rejection of Plaintiff's symptom testimony related to her seizure disorder and mental impairments.  Therefore, the ALJ erred in rejecting this testimony.

## B.    Weight Assigned to Physician's Opinions

Plaintiff argues that the ALJ erred by discounting the opinions of her treating physicians.[9]    In weighing medical source opinion evidence, the Ninth Circuit distinguishes between three types of physicians: (1) treating physicians, who treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, more weight is given to a treating

---

[9]  The regulations for evaluating medical evidence were recently amended.  However, the applicable regulations apply to claims filed on or after March 27, 2017 and, therefore, do not apply to this case.  *See* Revisions to Rules Regarding Evaluation of Medical Evidence, 2017 WL 168819 (Jan. 18, 2017).

physician's opinion. *Id.* The ALJ must provide clear and convincing reasons supported by substantial evidence for rejecting a treating or an examining physician's uncontradicted opinion. *Id.*; *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). An ALJ may reject the controverted opinion of a treating or an examining physician by providing specific and legitimate reasons that are supported by substantial evidence in the record. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.

Opinions from non-examining medical sources are entitled to less weight than opinions from treating or examining physicians. *Lester*, 81 F.3d at 831. Although an ALJ generally gives more weight to an examining physician's opinion than to a non-examining physician's opinion, a non-examining physician's opinion may nonetheless constitute substantial evidence if it is consistent with other independent evidence in the record. *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). When evaluating medical opinion evidence, the ALJ may consider "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; [and] the specialty of the physician providing the opinion . . . ." *Orn*, 495 F.3d at 631.

### C. Dr. Hicks' Opinions

On March 25, 2014, Dr. Hicks completed a "Medical Assessment of Claimant's Ability to Perform Work-Related Activities (Mental)." (Tr. 545-46.) He opined that Plaintiff had moderate impairment in her abilities to respond appropriately to co-workers and to perform simple tasks. (Tr. 545.) He opined that Plaintiff had moderately severe impairments in her abilities to relate to other people, engage in daily activities, attend to her "personal habits," and respond appropriately to supervision. (*Id.*) Dr. Hicks found Plaintiff's "constriction of interests" was severely impaired. (*Id.*) He also found that Plaintiff was severely impaired in her abilities to understand, remember, and carry out simple instructions, and to respond appropriately to customary work pressure. (*Id.*) Dr. Hicks opined that Plaintiff's psychiatric symptoms caused a "moderately severe"

impact on her ability to sustain work pace.  (Tr. 546.)  Dr. Hicks stated that he had considered his treatment notes and records from other providers and that the limitation he assessed "result from objective, clinical, or diagnostic findings which have been documented either by [Dr. Hicks] or elsewhere in [Plaintiff's] treatment records."  (*Id.*)

On October 2015, Dr. Hicks completed another assessment of Plaintiff's ability to perform work-related mental activities.  (Tr. 717-18.)  Dr. Hicks assessed similar limitations.  (*Compare* Tr. 545-46 *with* Tr. 717-18.)

### 1.    Weight Assigned Dr. Hicks' Opinions

The ALJ assigned Dr. Hicks' opinions "little weight" based on her conclusion that they were "not supported by the medical record" (Tr. 36 (citing Admin. Hrg. Exs. B11F at 3, B15F at 14, B19F at 1, and B31F at 50)), were provided on a "check-box" form, provided no specific work limitations pursuant to SSR 96-8p, and were vague, imprecise, and lacking explanation.  (Tr. 36.)

### a.    Not Supported by the Medical Record

The ALJ concluded that Dr. Hicks' findings of moderately severe to severe limitations in Plaintiff's abilities to deal with others, understand, carry out, and remember instructions, respond to supervision, respond to co-workers, respond to customary work pressures, and perform simple tasks, were not supported by the medical record.  (Tr. 36.) Lack of support in the medical record can be a specific and legitimate reason for rejecting Dr. Hicks' opinion.  *See Thomas*, 278 F.3d at 957 (an ALJ need not accept a medical opinion that is brief, conclusory, or inadequately supported by clinical findings); *Magallenes v. Bowen*, 881 F. 2d at 751 (a lack of supporting clinical findings is a legitimate reason to reject a physician's opinion); *Tommasetti*, 553 F. 3d at 1041 (the incongruity between a physician's opinion and the patient's record is a specific and legitimate reason to discount a physician's opinion).

To support her conclusion that Dr. Hicks' opinions were unsupported by the medical record, the ALJ cited two treatment notes from Dr. Hicks noting that Plaintiff's mood was good in July 2014 (Tr. 592 (July 29, 2014), Tr. 683 (Oct. 2014 treatment note

indicating that Plaintiff "was last seen on 7/29/2014 and stated that her mood was good at that time")), a treatment note from Dr. Hempelman stating that Plaintiff's "problems with depression [were] on an even keel" (Tr. 719), and a treatment note from Dr. Robert Allen stating that Plaintiff's anxiety was "under good control."[10] (Tr. 1012.) Plaintiff argues that this rationale is not supported by substantial evidence. (Doc. 17 at 17.) In response, the Commissioner argues that this constitutes substantial evidence to support the ALJ's conclusion. (Doc. 19 at 18.) The Commissioner further asserts that these "treatment notes are indicative of broader development" and that the record indicates that Plaintiff's "mental health showed sustained improvement." (*Id.*)

The record as a whole, however, indicates that Plaintiff had temporary improvement, but her symptoms "waxed and waned over time." *See Attmore v. Colvin*, 827 F.3d 872, 878 (9th Cir. 2016). Dr. Hicks frequently observed that Plaintiff had a congruent mood, a goal directed thought process, intact insight and judgment, and was alert and oriented. (*See* Tr. 323-24, 327-29, 339-41, 343-44. 347-48, 550-52, 559-60, 592-93, 597-98, 693-95.) However, Dr. Hicks also noted that Plaintiff's depression worsened following a period of stability. (Tr. 563 (December 2013 treatment note stating that Plaintiff had been "stable" at her last appointment in August, but she reported worsening depression over the past six to seven weeks with suicidal thoughts and a plan to overdose).) Dr. Hicks also described Plaintiff's depression as "treatment resistant." (Tr. 599, 550, 679.) Plaintiff also reported suicidal thoughts to Dr. Hicks and Dr. Roberson at various times throughout her treatment history, including after she had reported that her mood was good in July 2014. (Tr. 655, 659 (May 2013), Tr. 564 (Dec. 2013), Tr. 614 (Aug. 2014), Tr. 609 and Tr. 611 (Sept. 2014), Tr. 607 (Oct. 2014), Tr. 676 (Jan. 2015).)

---

[10] Plaintiff criticizes the ALJ for citing two treatment notes from other doctors to discredit Dr. Hicks' opinions. (Doc. 17 at 17.) The Courts finds no error with the ALJ's citation to other doctors' treatment notes because Dr. Hicks noted that his opinions were based on his review of his own and other medical records (Tr. 546, 718), and because the ALJ concluded that Dr. Hicks' opinions were not supported by the medical record, not just unsupported only by his own treatment notes. (Tr. 36.)

At different times, Dr. Hicks or Dr. Roberson noted that Plaintiff was anxious and depressed (Tr. 655 and Tr. 659 (May 2013), Tr. 609 and Tr. 611 (Sept. 2014), Tr. 607 (Oct. 2014), confused (Tr. 607 (Oct. 2014), Tr. 609 and Tr. 611 (Sept. 2014), had a restricted affect, and a sad and depressed mood (Tr. 564 (Dec. 2013); and had intermittent eye contact, slow and soft speech, retarded psychomotor activity, a blunted affect and a sad/depressed mood, and circumstantial thought process. (Tr. 555-56 (Mar. 2014).) Additionally, in fall 2014, Dr. Roberson noted that Plaintiff's diagnosis had "declined." (Tr. 607, 609.)

Considering the evidence that Plaintiff had "treatment resistant depression" and that her mental health symptoms fluctuated, the Court concludes that evidence of Plaintiff's occasional improvement (Tr. 36 (citing Admin. Hrg. Exs. B11F at 3, B15F at 14, B19F at 1, B31F at 50)) is not substantial evidence to support the ALJ's conclusion that Dr. Hicks' opinions were unsupported by the medical record.

### b. Vague Opinions Provided on Check-Box Forms

The ALJ also discounted Dr. Hicks' opinions because they appeared on check-box forms, and were vague and imprecise. (Tr. 36.) As set forth in Section VI.C, Dr. Hicks provided specific opinions on Plaintiff's mental functional abilities. (Tr. 545-46, 717-18.) Additionally, the assessment form that Dr. Hicks completed indicates that the assessed limitations were based on his treatment of Plaintiff and his treatment notes. (Tr. 545-46.) The assessment form instructed Dr. Hicks that his "estimate of [Plaintiff's] psychiatric impairments" should be "consistent with [his] record." (Tr. 545.) Dr. Hicks also confirmed that to complete the assessment form, he "considered and/or reviewed [his] treatment notes, records from other providers, mental status examinations, [and Plaintiff's] responses to treatment." (Tr. 546.)

Therefore, Dr. Hicks' opinions on the check box form are supported by his medical treatment history with Plaintiff. *See Garrison v. Colvin*, 759 F.3d 995, 1013, 1014 n.17 (9th Cir. 2014) (stating that the ALJ erred by "failing to recognize that the opinions expressed in check-box form . . . were based on significant experience with [the

claimant] and supported by numerous records, and were therefore entitled to weight that an otherwise unsupported and unexplained check-box form would not merit."); *Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014) (noting that the treating physician opinions were on a "'check-box' form and contain[ed] almost no detail or explanation," however, the ALJ erred in rejecting those opinions as conclusory or unexplained because "they [were] consistent both with [c]laimant's testimony at the hearing and with [the physician's] own extensive treatment notes"); *Mansour v. Astrue*, 2009 WL 272865, at *6 n.14 (C.D. Cal. Feb. 2, 2009) (rejecting contention that treating physician's opinion on a "check-the-box" form lacked supporting evidence to substantiate the responses on the form because "progress notes in the record" and the physician's treatment notes supported his finding on the opinion form). Accordingly, the Commissioner's assertion that Dr. Hicks did not sufficiently explain the basis for his opinions is not a legally sufficient reason for rejecting his opinions.

### c. Failed to Provide Specific Work Limitations

The ALJ also rejected Dr. Hicks' opinions because he did not provide "specific work limitations pursuant to SSR [Social Security Ruling] 96-8p." (Tr. 36.) Social Security Ruling 96-8p pertains to the assessment of a claimant's RFC. SSR 96-8p, 1996 WL 374184 (Jul. 2, 1996). It provides that the RFC must identify the claimant's "functional limitations or restrictions and assess his or her work-related abilities of a function-by-function basis." *Id*. at *1.

The Commissioner does not discuss, and thus does not defend, this rationale for the ALJ's rejection of Dr. Hicks' opinions. (Doc. 19 at 17 -19.) Additionally, the record does not support the ALJ's conclusion that Dr. Hicks did not assess work limitations. Dr. Hicks opined that Plaintiff's psychiatric symptoms caused moderately severe limitations in her ability to sustain work pace. (Tr. 545-56, Tr. 717-18.) "Moderately severe" was defined as "off-task 16-20% of an 8-hour work day." (Tr. 546, 718.) Dr. Hicks also assessed Plaintiff's degree of limitation in performing other work-related activities including understanding, carrying out, and remembering instructions,

responding appropriately to supervision and co-workers, responding appropriately to work pressure, and performing simple tasks. (Tr. 545, 717.)

In summary, because the ALJ's reasons for discounting Dr. Hicks' opinions are not supported by substantial evidence in the record, the ALJ erred in discounting Dr. Hicks' opinions. *See Bayliss*, 427 F.3d at 1216      .

## D.    Dr. Roberson's Opinions

In August 2015, Dr. Roberson completed a "Medical Assessment of Claimant's Ability to Perform Work-Related Activities (Mental)." (Tr. 686-87.) He opined that Plaintiff had moderate impairment in her abilities to respond appropriately to co-workers and to respond to customary work pressure. (Tr. 688) He opined that Plaintiff's ability to sustain work pace was moderately severely impaired. (Tr. 687.)

In February 2016, Dr. Roberson completed another assessment of Plaintiff's ability to perform work-related mental activities. (Tr. 746-47.) Dr. Roberson noted that Plaintiff's "condition had worsened with increased physical pain." (Tr. 746.) He opined that Plaintiff had moderate limitations in her abilities to respond appropriately to supervision, co-workers, and customary work pressure. (*Id.*) He also opined that Plaintiff's ability to sustain work was moderately severely impaired. (Tr. 747.) Dr. Roberson noted that his opinions were based on Plaintiff's medical history, including consultation with her psychiatrist. (*Id.*) Dr. Roberson was "worr[ied] about the severity of her depression." (*Id.*)

### 1.    Weight Assigned Dr. Roberson's Opinions

The ALJ assigned Dr. Roberson's opinions "little weight" based on her conclusion that they were provided on check-box forms without any rationale, the opinions were provided as an accommodation to Plaintiff, the limitations Dr. Roberson assessed were not reasonable considering Plaintiff's activities of daily living, and his opinions were not supported by the mental health treatment records. (Tr. 36.)

#### a.    Opinions Provided on Check-Box Forms

The ALJ discounted Dr. Roberson's opinions because they appeared on check-box forms without supporting rationale. (Tr. 36.)   The Court concludes that this is not a legally sufficient reason for discounting Dr. Roberson's opinions.

The assessment forms that Dr. Roberson completed instructed that his "estimate of [Plaintiff's] psychiatric impairments" should be "consistent with [his] record." (Tr. 686, 746)   Dr. Roberson also stated that his "conclusions were based on his clinical observations" (Tr. 687), Plaintiff's medical history (Tr. 747), and his consultation with Plaintiff's psychiatrist.   (*Id.*)   Therefore, Dr. Roberson's opinions are supported by his medical treatment history with Plaintiff.   *See Garrison*, 759 F.3d at 1013, 1014 n.17. Accordingly, the Commissioner's assertion that Dr. Roberson did not provide rationale to support his opinions on the assessment forms is not a legally sufficient reason for rejecting his opinions.

#### b.    Accommodation to Plaintiff

The ALJ also rejected Dr. Roberson's opinions on the ground that they "appeared to have been completed as an accommodation to [Plaintiff]." (Tr. 36.)  Plaintiff asserts that this is not a sufficient reason for discounting Dr. Roberson's opinions because the ALJ did not provide any support for this conclusion. (Doc. 17 at 15.)  The Commissioner does not defend this rationale.  (Doc. 19 at 15-17.)   Accordingly, the Court does not further consider this rationale for the ALJ's rejection of Dr. Roberson's opinions.

#### c.    Inconsistent with Plaintiff's Daily Activities

The ALJ further stated that she rejected Dr. Roberson's opinions because they were "not reasonable when considering the claimant's admitted activities of daily living, which have been described in detail above in this decision." (Tr. 36.)  Plaintiff asserts that this reason is not supported by substantial evidence in the record. (Doc. 17 at 15.)

As Plaintiff notes, the ALJ did not identify any particular limitation that Dr. Roberson assessed and explain how that limitation was inconsistent with any particular activity.   (Tr. 36.)   The ALJ's conclusory assertion that the limitations

Dr. Roberson assessed were inconsistent with Plaintiff's activities of daily living does not satisfy the standard required for rejecting an examining physician's opinion. *See* 20 C.F.R. §§ 404.1527, 416.927; *Reddick*, 157 F.3d at 725 (explaining that an ALJ provides "specific and legitimate reasons for rejecting a contradicted opinion "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."); *Swanson v. Sec'y of Health and Human Servs*, 763 F.2d 1061, 1065 (9th Cir. 1985) (same). The ALJ must do more than offer his conclusions. "He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988); *see also Widmark v. Barnhart*, 454 F.3d 1063, 1069 (9th Cir. 2006). The ALJ did not satisfy this burden in concluding, without explanation, that Dr. Roberson's opinions were "not reasonable when considering Plaintiff's admitted activities of daily living." (Tr. 36.)

### d. Not Supported by the Medical Record

The ALJ further concluded that Dr. Roberson's assessed limitations were "not supported by mental health treatment records showing [Plaintiff's] mood was generally good with medication and treatment." (Tr. 36 (citing Admin. Hrg. Ex. 15F at 14).) Lack of support in the record is a specific and legitimate reason for rejecting a treating physician's opinion. *See Thomas*, 278 F.3d at 957. However, that rationale is not supported by substantial evidence in this case.

To support her conclusion that Dr. Roberson's opinions were unsupported by the treatment records, the ALJ cited an October 2014 treatment note completed by Dr. Hicks indicating that Plaintiff "was last seen on 7/29/2014 and stated that her mood was good at that time." (Tr. 683; Tr. 36 (citing Admin. Hrg. Ex. B15F at 14).) For the reasons set forth in Section VI.C.1.a, the Court concludes that evidence of occasional improvement in Plaintiff's mood is not substantial evidence to support the ALJ's conclusion that Dr. Roberson's opinions were unsupported by the medical record.

In summary, because the ALJ's reasons for discounting Dr. Roberson's opinions are not supported by substantial evidence in the record, the ALJ erred in discounting Dr. Roberson's opinions. *See Bayliss*, 427 F.3d at 1216.

**E.     Dr. Hempelman's Opinions**

On January 22, 2014, Dr. Hempelman completed a "Medical Assessment of Ability to do Work-Related Physical Activities." (Doc. 460-61.) He opined that Plaintiff's seizures, anxiety, and fibromyalgia would limit her ability to perform work-related activities. (Tr. 460.) Dr. Hempelman noted that Plaintiff had headaches three times per month and seizures up to three times per day. (*Id*.) Plaintiff's headaches or seizures lasted up to five minutes at a time. (*Id*.) Plaintiff's headaches and seizures were accompanied by nausea, pain, and fatigue. (*Id*.) Dr. Hempelman noted that stress increased Plaintiff's symptoms and that that there was "no relief available." (*Id*.) Dr. Hempelman opined that Plaintiff was "total[ly]" restricted in activities involving unprotected heights, moving machinery, marked changes in temperature or humidity, driving automated equipment, and exposure to dust, fumes, and gas. (*Id*.) Dr. Hempelman opined that Plaintiff's symptoms were moderately severe, and would cause her to be off task 16-20% of an eight-hour workday. (Tr. 461.)

In February 2015, Dr. Hempelman completed another medical assessment of work-related physical activities. (Tr. 668-69.) Dr. Hempelman indicated that Plaintiff had headaches, seizures, and depression that limited her ability to perform work-related activities. (Tr. 668.) He noted that Plaintiff experienced headaches five times per week, seizures two-to-three times per week, and was depressed "all day every day." (*Id*.) He opined that Plaintiff's headaches and seizures lasted an average of "3 hours or more." (*Id*.) Dr. Hempelman opined that Plaintiff also experienced fatigue. (*Id*.) Plaintiff's symptoms were increased by stress, and decreased by rest ("reclining and/or lying down"), and by medications. (*Id*.) He noted that Plaintiff's medications could impact her memory. (Tr. 669.) Dr. Hempelman opined that Plaintiff was "total[ly]" restricted in activities involving unprotected heights, moving machinery, marked changes in

temperature or humidity, and driving automotive equipment. (*Id.*) She was "moderate[ly] restricted in activities involving exposure to dust, fumes, and gases." (*Id.*) Dr. Hempelman again opined that Plaintiff's symptoms were moderately severe, causing her to be off task 16-20% of an eight-hour workday. (Tr. 669.)

### 1.    The ALJ's Assessment of Dr. Hempelman's Opinions

The ALJ assigned "little weight" to Dr. Hempelman's opinions. (Tr. 35.) The ALJ explained that the "check-list style forms appeared to have been completed as an accommodation to [Plaintiff]," only included conclusions as to Plaintiff's functional limitations without any rationale, and were not supported by Dr. Hempelman's clinical findings and treatment notes, which indicated that Plaintiff was "seizure free for three months." (*Id.*) Plaintiff asserts that the ALJ erred by discounting Dr. Hempelman's opinions on these grounds. (Doc. 17 at 14-17.) The Commissioner defends the ALJ's rationale. (Doc. 19 at 14-15.)

### a.    Conclusory Opinions on Check-Box Form

The ALJ discounted Dr. Hempelman's opinions because they were conclusory and appeared on check-box form without supporting rationale. (Tr. 35.) "[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings." *Batson*, 359 F.3d at 1195. Dr. Hempelman's assessments are on "check-box" forms and contain little detail or explanation. (Tr. 460-61, Tr. 668-69.) However, Dr. Hempelman indicated that the assessed limitations "could reasonably be expected to result from objective clinical or diagnostic findings which have been documented either by [him], or elsewhere in Claimant's medical records." (Tr. 461, 469.) Therefore, Dr. Hempelman's opinions are supported by Plaintiff's medical treatment history. *See Garrison*, 759 F.3d 995 at 1013, 1014 n.17. Accordingly, the Commissioner's rejection of Dr. Hempelman's opinions on that ground that they appeared on check-box forms and were not sufficiently explained is not a legally sufficient reason for rejecting Dr. Hempelman's opinions.

### b.  Accommodation to Plaintiff

The ALJ also rejected Dr. Hempelman's opinions on the ground that they "appeared to have been completed as an accommodation to [Plaintiff]." (Tr. 35.) Plaintiff asserts that this is not a sufficient reason for discounting Dr. Hempelman's opinions because the ALJ did not provide any support for this conclusion. (Doc. 17 at 15.) The Commissioner does not defend this rationale. (Doc. 19 at 14-15.) Accordingly, the Court does not further consider this rationale for the ALJ's rejection of Dr. Hempelman's opinions.

### c.  Failed to Provide Specific Work Limitations

The ALJ also rejected Dr. Hempelman's opinions because he did not provide "specific work limitations pursuant to SSR [Social Security Ruling] 96-8p." (Tr. 35.) As previously stated, Social Security Ruling 96-8p pertains to the assessment of a claimant's RFC. SSR 96-8p, 1996 WL 374184 (Jul. 2, 1996). It provides that the RFC must identify the claimant's "functional limitations or restrictions and assess his or her work-related abilities of a function-by-function basis." *Id*. at *1.

The Commissioner does not defend this rationale for the ALJ's rejection of Dr. Hempelman's opinions. (Doc. 19 at 13-15.) Additionally, the record does not support the ALJ's conclusion that Dr. Hempelman did not assess work limitations. Dr. Hempelman opined that Plaintiff's psychiatric symptoms caused moderately severe limitations in her ability to stay on task. (Tr. 460-61, Tr. 668-69.) "Moderately severe" was defined as "off-task 16-20% of an 8-hour work day." (Tr. 461 669.)

### d.  Not Supported by the Medical Record

The ALJ also concluded that Dr. Hempelman's opinions were not supported by the medical record. (Tr. 35.) An ALJ may reject a treating physician's opinion that lacks supporting clinical findings. *See Thomas*, 278 F.3d at 957. Plaintiff argues that this rationale is not supported by substantial evidence. (Doc. 17 at 15.)

To support her conclusion that Dr. Hempelman's opinions were unsupported by the medical record, the ALJ cited a July 2014 treatment note indicating that Plaintiff had

been seizure-free for three months. (Tr. 35 (citing Admin. Hrg. Ex. B12F at 1).) However, "[o]ccasional symptom-free periods . . . are not inconsistent with disability." *Lester,* 81 F.3d at 833. Additionally, the record reflects that Plaintiff continued to have seizures after that seizure-free period. (Tr. 725, Tr. 927.) The treatment notes, as a whole, indicate that Plaintiff's seizure disorder was difficult to control and that the frequency of her seizures varied. (Tr. 449, 335, 440, 433, 427, 568); *see Ghanim,* 763 F.3d at 1164 (stating that "the treatment records must be viewed in light of the overall diagnostic record."). Therefore, the Court concludes that substantial evidence does not support the ALJ's conclusion that Dr. Hempelman's opinions regarding the severity of Plaintiff's seizure disorder was not supported by the objective medical evidence.

In summary, because the ALJ's reasons for discounting Dr. Hempelman's opinions were not supported by substantial evidence in the record, the ALJ erred in discounting Dr. Hempelman's opinions. *See Bayliss v. Barnhart,* 427 F.3d 1211, 1216.

## VII.    Remand for an Award of Benefits

As set forth above, the ALJ did not provide clear and convincing reasons for discounting Plaintiff's symptom testimony related to her seizure disorder or her mental impairments. Additionally, she did not provide legally sufficient reasons for discounting the opinions of treating physicians Dr. Hicks, Dr. Roberson, and Dr. Hempelman.

Under the Ninth Circuit's credit-as-true standard, courts may credit as true improperly rejected medical opinions or claimant testimony and remand for an award of benefits if each of the following are satisfied: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison,* 759 F.3d at 1020 (citing *Ryan,* 528 F.3d at 1202). If the "credit-as-true rule" is satisfied, the court may remand for further proceedings, instead of for an award of benefits, "when the record as a whole creates serious doubt as to whether the claimant is,

in fact, disabled within the meaning of the Social Security Act." *Garrison*, 759 F.3d at 1021.

Here, the Court finds that the record has been fully developed and further administrative proceedings would serve no useful purpose. Further, as detailed above, the Court finds that the ALJ has failed to provide legally sufficient reasons for rejecting the opinions of Dr. Hicks, Dr. Roberson, and Dr. Hempelman. Finally, according to the vocational expert's testimony, if those opinions are credited as true, Plaintiff would be disabled under the Act. (Tr. 74-75.) The record does not create serious doubt as to whether Plaintiff is disabled under the Act. *See Garrison*, 759 F.3d at 1021.

Accordingly,

**IT IS ORDERED** that the Commissioner's decision is **REVERSED** and this matter is remanded for a determination of benefits.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in favor of Plaintiff and terminate this case.

Dated this 6th day of July, 2018.

Bridget S. Bade
United States Magistrate Judge